Good morning, Your Honor, and members of the Court. My name is John Fine, and I represent Eve Mazzarella. In my initial six minutes, I'm splitting the time with my co-counsel, there are three points I'd like to make about the Brady issue. The first point has to do with the immunity granted to Jennifer Wolfe. There's a dispute about this. Ms. Wolfe testified in the Marciotti trial, which was held after Ms. Mazzarella's trial, that she had received immunity. The government now disputes that, although it did not at the time of the Marciotti trial. There is a portion of Ms. Mazzarella's trial, the direct examination, and I had overlooked until very recently, but I brought it to Mr. Evans' attention, and I want to bring it to the Court's attention because I think it's important on this question. What I'm talking about is page 5476 of the trial transcript, line 24. This is file 25 from November 28, 2011. At that portion of the transcript, the prosecutor, Mr. Pugh, is asking Ms. Wolfe on direct examination about a number of his actions, and in the course of asking her those questions, he says the following. He says, question now, as part of your obligation to testify in this case, did you meet with the government, meaning me, to prepare for your testimony? And she says, yes. Now, I have missed the significance of that, but when you look at it in light of the Marciotti testimony, it could almost mean that she had some sort of an agreement with the government. Now, if Mr. Pugh had been referring back. Well, because if Mr. Pugh had been referring simply to A.C. Peena, what creates an obligation to testify? Well, it could be A.C. Peena, but A.C. Peena doesn't entail any obligation to meet with the government. If you have an obligation that includes a requirement to meet with the government, it is an agreement of some kind, a cooperation agreement of some kind. Now, he doesn't say anything about it here, but later on when Ms. Walt is being asked at the Marciotti trial about her obligation to come in and testify, that's when she is asked, did you get impunity in return? And she says, yes. She had an obligation to testify. She had an agreement with the government and an obligation to testify, and then twice she met with the government. So that's the first point. I want to make the point, I want to call that portion of the transcript to the Constitution. The second point I want to make has to do with materiality, which is really the crux of it. Before you do it, would you put a witness on not knowing that you're going to say, I'm sorry, you're saying? It would depend on whether the witness would meet with me. In general, no. But, Your Honor, the point I want to make here, though, is that we're talking about an obligation to testify that includes meeting with the government. As part of your obligation to testify, did you meet with me? That is the language of someone who is cooperating with the government, who has a cooperation agreement of some kind with the government. Now, that doesn't necessarily entail impunity, but it does support the notion that there was an agreement between us, and that, of course, later on, Ms. Wolfe testifies on the Marciotti trial, that in return for her obligation to come in and testify, she received impunity. Answer that. Well, but then the AUSA testified on it, but they went back and they had no discussion about impunity. You did testify. She testified. Her argument, though, is that just because they met, that there must have been some kind of an agreement between them. I don't understand that. No. My argument is Ms. Wolfe testified under oath on the Marciotti trial that she had an agreement that included a meeting. And that was never contradicted at the time. All right. There was a kind of a misunderstanding on her part, it appears, after they went back. Well. And did she testify that she thought that because she was testifying that she wouldn't be prosecuted? She testified. Ms. Wolfe did. It was a very short exchange. Did she have an obligation to come in and testify? Yes. And I think her language was if you came in and testified, she would not be prosecuted. And she said yes. So that was her testimony, which was not contradicted at the time. The significance of this earlier testimony in the Pizzarella trial then suggests pretty strongly, to my mind, that there was some sort of an agreement between Ms. Wolfe and the government. She has an immunity. Well, it was remanded, and that's what was supposed to be clarified, and I thought it was. But Ms. Wolfe didn't testify. There were personal reasons, as I understand it. We couldn't get her to even testify. So the record is that her understanding didn't change. What we have is. Is it the only party to the meeting? It's about to leave February 2001. It's not the second point I want to make, and we've got to be careful here because I don't want to. Right. Go ahead. She has to do it materially, and I'll just say this. Number one, it has to be an individualized determination. The government talks about Grieve and Pizzarella as if they're twins. They're not. It has to be an individualized determination based on the evidence against each defendant. Number two, the evidence against Ms. Pizzarella, the government has talked successfully so far about there were 15-plus witnesses. There were 1,300 defendants. It makes it sound like there was just this overwhelming amount of evidence against Ms. Pizzarella, but there wasn't. And what I want to do, I don't have time to go through it in detail, but I want to point the court to our reply group where we analyze the witnesses and the evidence against Ms. Pizzarella in some detail. We go through in tedious detail the number of witnesses and what was covered. And the bottom line is this. There were essentially eight witnesses in that case, on the issue of false loan applications about Ms. Pizzarella. Four of them were either to be impaired at the time, Skip Young, Bill Labese, and a fellow named Devin Miller. The other four were these four witnesses who appeared to be simple witnesses with no motivation to do anything to favor the government. It turns out, two of them had immunity. One of them wanted a job, and the other one was a fraudster who, if the government had known what the FBI knew, they would never have called him to office, Mr. Security. So, just this materiality question, I implore the court not to simply accept the notion that 50-plus witnesses or 3,900 defendants and so on must not be considered. The final point I want to make has to do with the Turner case, which is now before the Supreme Court. It's funny, it hasn't gotten more important, but there is a case right now before the Supreme Court involving the question of breach materiality. Turner v. United States was argued in late March. It will undoubtedly come out before the end of June. And all I would say to the court is, because materiality is the issue here when it comes to granting peace, please consider at least holding this case until that peace comes out, because it may have a real impact on witnesses. And I'll reserve whatever little bit of time I have for questions. Good morning, Your Honor. Today, please the court will finish on behalf of Stephen Grimm. And I just wanted to address a question that Your Honor had about Ms. Wolfe and the subsequent testimony from Mr. Pugh, the prior prosecutor in this case. Now, certainly, Mr. Pugh testified at the hearing that we had on remand in this case that he did not give Ms. Wolfe immunity. However, what's important to keep in mind here is, and this sounds a little bit trite, but there is the old saying, where there's smoke, there's fire. And frankly, Your Honor, you've got a lot of smoke here. You have Mr. Pugh saying now, oh, I don't remember ever saying that to her. I don't think I ever said that to her. But Mr. Pugh was the same person who had given immunity to Ms. Brown, and Mr. Martin had failed him to disclose that to my client prior to trial. And he's also, he testified at the hearing, that at the time when he granted Ms. Brown verbal immunity, that he didn't think it was important to memorialize that. And that's at page 1186 of the record in this case. And then eventually he recalled immunity. And quite frankly, Your Honors, we're in a position now where I don't know if the prosecutors in this case will later remember something else that they failed to disclose. It's important to remember the three violations in this case didn't occur in a vacuum. This isn't just about the Grimm and Mazzarella trial. It's about the cases that were also going on in the periphery, including the case of David Mark, who was supposed to be a witness in this case, ended up getting prosecuted. And this court actually ended up vacating his conviction because the government had failed to document a conversation they had with Mr. Mark in July of 2011, where he allegedly breached whatever immunity agreement he had with them. There's no record of that. And I think your colleague in the concurring opinion that Mark said, this was a case where there's abysmal record-keeping. And there are several examples that also came out of abysmal record-keeping during the evidentiary hearing in this matter, including, one, there was a map that was drawn by Mr. Mark and Ms. Brown. I always get those two confused. There was a map of the facilities that the government wanted to search, as did one of the agents in this case testified at the hearing. That map is disappearing. Now, we were faulted, and I'm going to switch gears just a little bit because I want to touch on the Fourth Amendment issue because part of the remand from Ms. Mazzarella's original appeal that also affected my client is, was there a Fourth Amendment search that violated my client's rights? And the evidence that was deduced at the evidentiary hearing in this matter indicates that there most likely was a search that was at the behest of the – and I'm running short on time, so I'll try and keep this very quick. There was a search that was conducted by Mr. Mark and Ms. Brown at the behest of the agents in this case. And I know that the government has made a great deal of noise about the deference this court has to give to the credibility determinations of the judge, but I would just remind the court that a credibility determination, while there's a lot of deference to that, it has to be something that is consistent with all of the research. And when you compare the testimony of the agents in the – in the Mr. Mark evidentiary hearing when Mr. Mark was at trial, and you compare their testimony now, and you see that there's a great divide between a bit of uncertainty or uncertainty, I don't know, if we asked them to copy the documents, and then later when it came to our evidentiary hearing, they were absolutely certain it didn't occur. Well, you know, there's records that are missing. There were some – there were some inconsistencies. But if there was a search, the evidentiary hearing appeared to conclude that none of the documents that were used at the trial could ever be traced to any such search. So it's hard to say that there was a violation of your client's rights that affected this trial. Your Honor, I think that the point that we raised in – that I raised in my reply brief, or I'm sorry, my opening brief is, that you can – what Mr. Pugh testified is that he presented the exhibits at trial based on documents that he had subpoenaed. The question this Court has to ask is, how did he know what documents to subpoena? And I believe the answer may be that he knew what documents to subpoena because he had a stack of 3,000 pages of documents that were illegally copied by Mr. Orr and Ms. Brown. But, you know, as you said, there was a lot of smoke. And so we remanded to try to get him to cut through the smoke and figure out what actually happened. And we asked the district court, did its best to look at all of this and determine that there was respect to this alleged violation of rights with respect to the search, that there was no harm. I don't know what we can do with that now. Well, Your Honor, I think that that was – and I see I'm running low on time, and I hope that we – so I'm not prejudicing my colleague here. Okay. So I think part of the issue is, Your Honor, is that the court really – I hope that this answers your question. I think the court gave very short shrift to listening to the testimony and weighing the credibility of what Mr. Mark and Ms. Brown said. They have consistently testified over the course of now, I believe, three years with no incentive – in fact, in the case of Mr. Mark, he had every incentive not to be dishonest and not to change his testimony. Because as the U.S. Attorney reminded us at the beginning of the evidentiary hearing, we're going to be listening to his testimony, and if we think that he's committing perjury, we're going to get him for that. So I think when you look at – I think that the court just did not listen and properly weigh the credibility of the testimony from Mr. Mark and Ms. Brown in this case. I'm content that answered your question, Your Honor. Okay. Yeah. With that, I'll just say, disappointingly, Mr. Court, you did quite do it right, is what you're saying. That is correct, Your Honor. Thank you. Thank you. Please, the Court. Peter Luggett for the United States. Your auditors are asking the types of questions that reveal your right on track. When this case came before the Ninth Circuit the first time, the panel assessed on the third Brady prong whether the Wolf allegations, the Kim-Brown allegations, and the Hanna allegations collectively added up to anything material within the meaning of Brady's third prong. And they said it didn't. They said, contrary to what judges Blockford and Franklin and Gould, they wrote, Judge Gould was the author, saying there was no probability that a jury would have reached a contrary result. The strength of the prosecution's case, coupled with the relevant weakness of the Crawford impeachment evidence, and that's Wolf and Brown and Hanna, leads us to conclude that there was no prejudice. That's 784, Fifth Third, and 539. So, we start with that. How did that seem resolved in the case? Quite the doubt. Assessing materiality the first time around. So, it goes back. And after remand, the defendants are afforded full discovery and basically a likely chaperone field trip to the FBI's offices to poke around through the files and find anything. This is basically open file discovery before the evidentiary hearing. If there's anything you can find to bolster your claim of a Brady violation, have it. They came up with nothing. The only thing they came up with is what they had the first time, which was Chana Sadeer, who's a shady customer, who we just testified peripherally as the count one, as did so many other witnesses. So, that's materiality. With Sadeer, with Wolf, with Hanna and Brown, we have nothing here. After reading 7,200 pages of damning, inculpatory evidence that calls into question the confidence in these multiple verdicts, then we go to the first Brady call. Let me make sure I understand. This was remanded with respect to issues that were raised in the Washington trial, is that correct? Yes. So, the underlying convictions are no longer an issue? Correct, Your Honor. But we know from this Court's precedent that in performing a Brady materiality analysis, we just looked at it. Correct. Your Honor is correct. So, that should end the inquiry. But even if we look at this, did Jennifer Wolfe even have immunity? She didn't. First of all, it's the defendant's burden to establish an executory bilateral contract was formed in the first instance. They didn't do that. They point to this one. It was, yes, that Jennifer Wolfe stammered out in response to a confusing question at the Marcianti trial years after. That's what they have on this. On the other side, we called. They didn't call Jennifer Wolfe. She was sick. I heard her. She was sick. So, she's sick. They could have gone out and gotten an affidavit from her. They didn't do that. They could have got the continuance of the evidentiary hearing until she was feeling better. They didn't do that. They could have called Jennifer Wolfe's lawyer, who was in the meeting with Jennifer Wolfe when she met with the U.S. attorneys, and his lawyer on there, and got Trump to coax him into saying, now, did they extend an immunity offer to your client? They didn't get the lawyer. And I respectfully submit that a plausible explanation for why they didn't do it is because this lawyer would have said, offer immunity. They told her she wasn't a target. And from that, we formed the impression that she wasn't going to get prosecuted. The word immunity wasn't mentioned. So, we had a hearing we called, even though we don't have the burden of proof. We called AUSA Griswold and former USAQ, and AUSA Griswold, who was at this meeting with Wolfe and her attorney, said there was no discussion of immunity. There was no discussion that she would not be prosecuted. And when Brian Pugh was asked at the evidentiary hearing in front of Judge Mahan, the same question, and he answered no, but asked, as of October 2013, were you ever aware of Jennifer Wolfe ever being promised immunity? We also have AUSA Dan Sheets' affidavit, and he says that after he prosecuted the Marcianti case, and he asked Wolfe about this during a break, and she said, no, they told me I was not a target. And from that, she formed the understanding that she wouldn't be prosecuted. So, there is no, in the words of Wilson and this court's other president, there is no objective indicia of offer and acceptance. Now, Michelle, on behalf of Defendant Grimm, mentioned David Mark and Kim Brown. David Mark and Kim Brown are in a far different, and unfortunately for the government, successful situation. David Mark and Kim Brown came in to red out Yves Mazzarella before we indicted this case, did the search warrants in this case and indicted it. At the end of their debriefing with the former AUSA Pew, they asked, well, what's going to happen to us? And in response, and this is a matter of record, the former AUSA Pew said, unfortunately, just keep cooperating, and you have nothing to worry about. That is objective indicia of an immunity promise. We have nothing like that here. I believe I have covered most of the matters in the answering brief. Let me ask you about the census. Sure. And the forefisher, but there was another person involved in this, Beecroft. Yes. And in the Beecroft case, I think you said that the $107 million forfeiture order was excessive. Is that correct? That was the holding in Beecroft, yes. Now, was there a similar forfeiture order here? Yes, there was, Your Honor. And why wouldn't that be excessive as well? Well, several reasons, Your Honor. First of all, Grimm played a far bigger role than did Beecroft, who is essentially his bookkeeper, a pretty culpable one, and received a 36-month consodial sentence. But Grimm was the one, like Mazzarella, who recruited straw buyers for their names and credits, not Beecroft. Grimm was the one who paid them for scam purchases. Grimm was the one who falsely promised to pay the fees and expenses. Grimm was the one who had the money funneled to his Mazzarella Shell Corporation to throw in premier design. Grimm was the one who ordered the shredding of documents once he learned that an investigation had commenced. And Grimm and Mazzarella were the ones at Beecroft who ultimately left these straw buyers high and dry after their properties went into foreclosure. Who's the counsel? But wasn't our decision in Beecroft based on the comparison of the forfeiture amount to the maximum unallowable rather than the culpability? It was based partly on both, Your Honor. But as I pointed out in the answering brief, the government's position is that the Beecroft panel got it wrong when they said Beecroft could be fined no more than $1 million. She's getting the Beecroft panel's collective conscience appear to have been shocked, saying that she's getting hit with forfeiture 100 times the maximum fine. We read this, I explained this in the answering brief under 18 U.S.C. 3571d, that twice the gross loss, here the gross loss was $62 million. So it's doubled. It's not 100 times as all. That may be, but was the Beecroft decision after the district court's decision in Wyoming, and should we not have at least remanded and have the district court take another look at Wyoming Beecroft? I don't know the answer to the first question, and I would respectfully suggest no for the second question, Judge. I think at the end of the day, the Beecroft panel rejected the challenges to restitution, rejected her evidentiary challenges to forfeiture, upheld the validity of the $52 million amount, and rejected Beecroft's constitutional challenges on the forfeiture order imposed on her substantive convictions. Counts 10, 11, 13, and 14. All the Beecroft panel did was ask to count one conspiracy involving Beecroft, Grimm, and Mazzarella. She said she's a light player compared to those two in this conspiracy, and they said wrongly, I believe. She only could have had a $1 million maximum fine. I don't believe a remand in this situation, a second remand, would have any utility. Any other questions? Thank you. Thank you. We'll give you a minute and a half. Yeah. All right. Let me make a couple of quick points about Brady, and then I'll comment briefly on them. Firstly, on Brady, the original panel did not have a use of theory issue before. We had submitted the evidence, and the panel said consider that a remand is best, and it has to be considered cumulatively, and particularly as to Eve Mazzarella, his theory testimony was pretty poisonous. He came in, he portrayed himself as kind of a dupe. He portrayed her as greedy, manipulative, and he was really the only person I believe in the case which could testify that she lied to him correctly. Even then, in what's particularly important here, now that we've got the evidence here, the prosecutor said she would not have called him at all had she known about this information. So it's not just that he would have been impeached a little bit, but he would have given the same testimony. And that really awful testimony about Eve Mazzarella would have been removed from the record entirely. Add that now to the other impeachment immunity, for example, for Brown. Your Honor said in the Carrier case back in 1997 that immunity is a particularly important form of impeachment. We contend, as you've heard from both as well, and those jobs that you've witnessed, so she's four witnesses together, covered 900 pages of transcripts. All right. Your Honor, you're flipping through your time pretty fast. Okay. On sentence, I would just say this. A mistake of remand is appropriate, and on Beecroft, I would say, one of the reasons to remand is the question of disparity. Beecroft, the government, said that Ederson, as you've seen, was the engine of this fraud. So it was in 14,000, so long before Eve Mazzarella ever showed up. You see, it's gotten three years. There's a real disparity problem there, along with the other issues. Thank you. Your Honor, very briefly, just to answer your first question about Beecroft, the question when it was decided, it was decided in 2016. We had our evidentiary hearing in 2015, so I agree that remand would be appropriate for consideration of that issue. And then just touching briefly on materiality. Now, what this Court has said about what, and this is what the Supreme Court law is, evidence is material if the suppression of that evidence undermines confidence in the outcome of the trial. And it is further, and I'm quoting from Coring, that a reasonable probability exists even where the remaining evidence would be sufficient to convict the defendants. And I would just note that at page 39 of their answering brief, the government noted, conceded, that had they disclosed the impeachment information about Ms. Brown, that likely would have affected the outcome, and that I had been able to do an effective impeachment of Ms. Brown, that that likely would have affected the outcome of count 11, which was tied to her straw purchase. So we have the government admitting it with at least count 11, that there's materiality here. And with that, Your Honor, I'll submit. Thank you. Thank you. The matter is just argued. Our submitted presentation concludes the Court's calendar for this morning. The Court stands adjourned.
judges: Schroeder, Rawlinson, Stafford